**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHARON L. ALLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 994** |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Michael T. Mason** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Sharon L. Allen ("Allen" or "Claimant") brings this motion for summary judgment [22] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Allen's claim for disability insurance benefits under Sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act (the "SSA"), 42 U.S.C. §§ 416(i), 423(d) and 1382(c). The Commissioner filed a cross-motion for summary judgment [23], requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment [22] is denied and the Commissioner's cross-motion for summary judgment [23] is granted.

**I.     BACKGROUND**

**A.     Procedural History**

Allen filed applications for period of disability, disability insurance benefits and

supplemental security income on January 18, 2007. (R. 60-61). Claimant alleges that she has been disabled since October 28, 2006 due to brittle diabetes, fibromyalgia, retinopathy, hydrothryoidism, neuropathy, osteoarthritis, degenerative disc disease, cervical spine impairment, depression, hypertensive cardiovascular disease, hypertension, scoliosis, hyperlipidemia, and asthma. (R. 65). Her applications were initially denied on April 27, 2007, and again on September 20, 2007, after a timely request for reconsideration. (*Id.*). On October 16, 2007, Allen filed her request for a hearing. (R. 75). On September 18, 2008, she testified before Administrative Law Judge Denise McDuffie Martin (the "ALJ"). (R. 29-41). On April 7, 2009, the ALJ issued a decision denying Allen's disability claim. (R. 10-20). On April 28, 2009, Allen requested review by the Appeals Council. (R. 6). On January 7, 2010, the Appeals Council denied Allen's request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1-3); *Zurawski v. Halter*, 245 F.3d. 881, 883 (7th Cir. 2001). Allen subsequently filed this action in the District Court.

**B.    Medical Evidence**

Claimant began receiving treatment for her diabetes mellitus from Dr. Bhavani Sivarajan, an endocrinologist, in June 2004. While many of Dr. Sivarajan's records are illegible, it is clear that Allen saw Dr. Sivarajan regularly, that she was on an insulin pump, that the doctor often checked her feet and adjusted her medication, and that she was at times off of work to regulate her blood sugar. (R. 280-305). Claimant reported episodes of low blood sugar at work as well as retinopathy, hydrothryoidism, and fibromyalgia. (*Id.*). On March 3, 2005, Dr. Sivarajan noted that Claimant had "brittle" or uncontrolled Type 1 diabetes mellitus. (R. 290).

On March 30, 2005, Claimant was treated in the emergency room of Provena St. Joseph Medical Center ("St. Joseph's") for a possible hypoglycemic reaction. (R. 463). Allen reported several similar episodes in the past. (*Id.*). Claimant's insulin pump was suspended, she was given a meal, and her condition improved after treatment and observation. (R. 462-64). Claimant was released several hours later. (462).

On April 1, 2005, Claimant followed up with Dr. Sivarajan. He noted that Claimant had recurrent hypoglycemia. (R. 292). Allen was told not to drive and to avoid working with patients. (*Id.*). The records indicate hypoglycemia again on May 2, 2005. (R. 296). On May 16, 2005, Claimant reported no more hypoglycemia since she was last seen. (R. 297). Claimant stated that she wanted to return to work. (*Id.*).

Claimant was treated for a second time in St. Joseph's emergency room for a possible hypoglycemic reaction on July 24, 2005. (R. 469-476). She was combative and disoriented on arrival. (R. 471). Her insulin pump was removed and she improved with treatment and observation. (R. 471-473).

Claimant was treated for a third time in St. Joseph's emergency room on November 5, 2005. (R. 477-487). She had a change in behavior including an altered level of consciousness. (R. 480). The records state that Claimant reportedly has good control of her blood sugar and is compliant with prescribed medications, but has had similar episodes in the past with her insulin pump. (R.480). Allen was given lunch and intravenous medication and was discharged after two hours of observation. (R. 479-481). She was told to follow up with her personal physician. (R. 480).

Claimant saw Dr. Sivarajan next on March 16, 2006. (R. 298). Dr. Sivarajan stated that Claimant had "uncontrolled Type 1 [diabetes] certainly brittle." (*Id.*). On

October 3, 2006, Claimant called Dr. Sivarajan's office and reported that she was told she had to take time off from work that week and would need a note from the doctor stating she is able to work.  (R. 301).

On October 18, 2006, Claimant was hospitalized at St. Joseph's Medical Center following an acute hypoglycemic spell.  (R. 193, 198).  Her admission diagnoses indicated an acute hypoglycemic event, arteriosclerotic heart disease and mild atypical chest pain, as well as endstage complications of diabetes including neuropathy, rentinopathy, and coronary artery disease.  (R. 195).

Claimant was evaluated by Dr. Sivarajan during her hospitalization.  Dr. Sivarajan noted that Claimant has been a type 1 diabetic for more than forty-three years and has been on an insulin pump.  (R. 198).  Dr. Sivarajan stated that Claimant has multiple end organ damage, retinopathy, neuropathy, cardiovascular disease, peripheral vascular disease and possible proteinuria, microalbuminuria in the urine.  (*Id.*).  He further stated that Claimant has a history of previous multiple hypoglycemias like the one experienced on October 18, but had not experienced any in the past three months. Dr. Sivarajan also noted Claimant's history of coronary artery disease, a heart attack in 2003, angioplasties, bilateral laser surgery of the eyes for retinopathy, severe arthritis, hypertension, hyperlipidemia, gastroparesis, hypothyroidism, fibromyalgia and degenerative joint disease.

Dr. Sivarajan examined Claimant and noted that "she does have bilateral diabetic retinopathy" and "severe peripheral neuropathy on both lower extremities."  (R. 199). He diagnosed Claimant with hypoglycemia likely due to gastroparesis, made extensive adjustments to Claimant's medication, and recommended short term disability until the

hypoglycemia is corrected.  (*Id.*).  Dr. Sivarajan stated that Allen should be free of any hypoglycemic reaction for the next three months before re-evaluating her for work.  (*Id.*).

Claimant also saw Dr. Andrew Wunderlich, her primary care physician, while she was hospitalized. (R. 193-197).  Allen was diagnosed with an acute hypoglycemic spell, poorly controlled type 1 diabetes mellitus, arteriosclerotic heart disease, and atypical chest pain.  (R. 193).  Due to her complaints of chest pain, Dr. Wunderlich ordered an electrocardiogram and laboratory testing, both of which were unremarkable.  (Id.).  Claimant was discharged from the hospital on October 20, 2006.  (*Id.*).

On October 24, 2006, Allen saw Dr. Wunderlich's partner, Dr. Vemareddy, for an annual physical and follow-up on benign hypertension, dyslipidemia, hypothyroidism and asthma.  (R. 236-237).  Dr. Vemareddy noted that Claimant was recently hospitalized for a hypoglycemic episode.  (*Id.*)  Allen reported that she gets frequent hypoglycemic episodes secondary to gastroparesis.  (*Id.*).  She complained of bilateral burning pain in the bilateral feet and right knee osteoarthritis.  (*Id.*).  Dr. Vemareddy noted that Claimant was prescribed Cymbalta by Dr. Sivarajan for chronic depression. (*Id.*).  Dr. Vemareddy's assessment and plan noted the following: (1) Claimant suffered from "very brittle" insulin dependent diabetes mellitus that was managed by Dr. Sivarajan, that she would continue on Reglan for the diabetic gastroparesis, and that she should follow up with Dr. Sivarajan secondary to the frequent hypoglycemic events, (2) her benign hypertension was stable on Lisinoprel and Coreg, (3) Claimant's recent stress test was negative, she should continue taking Plavix and follow up with Dr. Ramaduri if she has chest pains or shortness of breath, (4) her dyslipidemia is under

good control and Claimant should continue with Lipitor, (5) Claimant has peripheral neuropathy likely secondary to the diabetes and should take Neurotonin three times a day, (6) Claimant's fibromyalgia is stable on Flexeril, and (7) the annual labs that were done during Claimant's hospitalization were within normal limits. (*Id.*).

On November 2, 2006, Claimant followed up with Dr. Sivarajan. She reported an episode of low blood sugar when she was in a meeting. (R. 303). Dr. Sivarajan adjusted her medication. (*Id.*). Claimant next saw Dr. Sivarajan on February 27, 2007. (R. 305). Her blood sugars were increased following an epidural steroid injection but she reported that they were better. (*Id.*).

Claimant followed up with Dr. Sivarajan on October 1, 2007, February 4, 2008 and June 2, 2008. (R. 400-405). While these records are somewhat illegible, it does not appear that Claimant reported any further hypoglycemic episodes at these office visits. (*Id.*).

On September 16, 2008, Claimant was treated in St. Joseph's emergency room for a hypoglycemic episode. (R. 488-504). Claimant accidentally ingested too much insulin. (R. 497). She was treated, observed and released after her condition improved. (R. 498).

In addition to receiving treatment for her diabetes, Claimant saw Dr. Murphy for left knee pain and lower back pain on a number of occasions between November 2006 and February 2007. (R. 258-274). A November 9, 2006 x-ray of Allen's left knee revealed severe osteoarthritis primarily in the medial and petellofemoral articulations. (R. 274). Claimant received a series of Hyalgan injections in her knee in November and December 2006. (R. 262-270). On December 28, 2006, Allen complained of pain in

her back radiating down her leg and numbness. (R. 262). Dr. Murphy noted Claimant's diabetic neuropathy and ordered an MRI of her back. (*Id*.). The MRI revealed degenerative changes at T12-L1 with some dorsal spondylosis, a bulging of the disc that extended no further dorsal than the spurs, and some flattening of the anterior surface of the conus. (R. 272). The exam was otherwise normal. (*Id*.).

Dr. Murphy saw Claimant again on January 17, 2007. (R. 260). He noted that while the MRI mentioned some disc space narrowing, there was no significant nerve compression or compromise. (*Id*.). He also noted that Claimant had good lumbar motion, pain in her lower spine with extension, negative straight leg raise, and tenderness in the upper lumbar region. (*Id*.). Dr. Murphy discussed therapy or an epidural as treatment options. (*Id*.). Allen chose to go forward with the epidural injection. (*Id*.). Claimant next saw Dr. Murphy on February 23, 2007. She reported that her knee was doing well and her back was getting markedly better following the epidural injection. (R. 258). Claimant had good range of motion and no tenderness. (*Id*.).

Claimant's medical records also document her heart condition. She had a heart attack followed by a stent placement in 2004. (R. 413, 446). However, she returned to work following that procedure. (R. 32-33). Claimant had stress tests on August 1, 2007 and April 23, 2008, both of which were within normal limits. (R. 417-422). She was stressed pharmacologically on both occasions rather than by exercise. (*Id*.).

The medical evidence also includes a report from a consultative examiner, Dr. Afiz Taiwo, prepared at the request of the Bureau of Disability Determination Services. (R. 324-328). Claimant underwent the consultative exam on April 1, 2007. (R. 324). Dr. Taiwo concluded that Claimant has cervical pain, lumbar pain, tenosynovitis of the

left wrist, osteoarthritis of the left knee, diabetes mellitus with diabetic retinopathy and neuropathy, and gait imbalance. (R. 327-328). He also noted that Claimant was obese. (R. 326). Testing of Claimant's eyes reveled that she is 20/50 in the right eye and 20/40 in the left eye. (*Id*.). Dr. Taiwo found that Claimant had tenderness at the medial joint in the left knee, crepitus with range of motion, and that her extension lagged 15 degrees. (R. 327). He observed that Claimant could get on and off the exam table with no difficulty, she could walk more than 50 feet without support, her gait was antalgic without an assistive device, she could not heel or toe walk, and that her range of motion of the shoulders, elbows, wrists, hips, right knee, ankle and cervical spine was not limited. (*Id*.). Dr. Taiwo noted tenderness at T9-L1 through L5 along the spine, flexion at 90 degrees with pain, and bilaterally negative straight leg raises. (*Id*.). He also found no signs of depression, agitation, irritability or anxiety. (*Id*.).

Finally, the medical evidence includes an August 4, 2008 State of Illinois Department of Human Services Medical Evaluation completed by one of Claimant's treaters, Dr. Verenna. (R. 413-415). Dr. Verenna had only seen Claimant once prior to completing this evaluation. (R. 413). The evaluation lists the following diagnoses: Type I diabetes mellitus with diabetic retinopathy, coronary artery disease post myocardial infarction in 2004, lumbar disc disease with lower extremity neuropathy, hyperlipidemia, hypertension, hypothyroidism, restrictive airway disease and lower extremity edema. (*Id*.). Dr. Verenna noted Claimant's 2007 MRI findings and objective findings of positive radicular pain, positive leg raise test, slow gait, no bending, and minimal twisting. (R. 414). Dr. Verenna also noted positive diabetic retinopathy, positive mild neuropathy, and frequent hypoglycemic episodes which require Glucogin 1-2 times per two week

period. (R. 415). With respect to Claimant's work related limitations, Dr. Verenna found that during an eight hour work day, Claimant could lift no more than ten pounds, she had 20 to 50% reduced capacity to walk, bend, stand, stoop and climb, and up to 20% reduced capacity to sit, turn, travel and perform activities of daily living. (R. 416). Dr. Verenna found that Claimant had full capacity with regards to pushing, pulling, speaking, fine manipulation, gross manipulation, and right and left finder dexterity. (*Id.*). On the mental impairment section of the evaluation form, Dr. Verenna wrote "N/A" and crossed out the section. (*Id.*).

### C. Claimant's Testimony

Allen testified before the ALJ on September 18, 2008. (R. 26-41). She was 53 years old at the time fo the hearing. (R. 32). Claimant testified that she went to college for nursing for three years, became a registered nurse ("RN"), and worked as an RN for thirty three years. (R. 32-33).

Claimant explained that she stopped working on October 18, 2006 because her diabetes had become very brittle and she would have low blood sugar without any warning. (R. 33). Allen testified that since that time, she has not worked and she has not been able to regulate her diabetes symptoms. (*Id.*). She said that her husband still has to give her Glucogin shots at times and that she has been in the emergency room for hypoglycemia frequently since October 2006. (*Id.*).

Claimant testified that when her blood sugar goes too low, she will stare and not respond appropriately to her husband. (R. 34). He checks her blood sugar and gives her a shot. (*Id.*). Allen said that she has no knowledge of what is going on during these episodes. (*Id.*). She testified that she has these episodes sometimes as frequently as

once a week.  (*Id.*).  Claimant explained that her husband will have to give her a shot sometimes every two weeks.  (*Id.*).

Allen testified that when she has a low blood sugar episode, it takes between a half an hour to two hours to get back to normal.  (R. 35).  She said that lately, it has been taking longer and that paramedics have had to give her D-50 intravenously because she does not come to.  (*Id.*).  Claimant testified that she also has seizures when this happens.  (*Id.*).  She said that the last five times she has had a low blood sugar episode, she has had a seizure.  (*Id.*).

Claimant testified that before she stopped working, she transferred positions and was doing pre-admissions for surgical patients.  (R. 35).  According to Allen, she was transferred to that job because it was less physically taxing.  (R. 36).  However, Allen said that she had difficulty doing that job as well because her blood sugar would go low.  (*Id.*).

Claimant testified about her other symptoms, including retinopathy and neuropathy.  (*Id.*).  She said that she has a lot of pain in her feet and that it is hard to walk.  (*Id.*).  Allen also testified that her feet are numb and that she experiences sharp burning pain sometimes in her toes and the top of her feet.  (*Id.*).  With respect to the retinopathy, Claimant testified that she has had nine laser surgeries to her eyes.  (*Id.*).  She explained that her eyes are sensitive to light and that she has trouble focusing, reading a computer and charting on a computer.  (*Id.*).

Next, Claimant testified that the bulging disc in her lower back causes pain in her lower back and down her leg, and numbness in her leg.  (R. 37).  Allen also said that she has a degenerative disc in her neck, scoliosis and fibromyalgia.  (*Id.*).  She testified

that the fibromyalgia causes pain in her upper back and shoulders. (*Id.*). Claimant also testified that she has osteoarthritis in both of her knees and that she cannot straighten the left knee. (*Id.*). She said that she has had injections in the left knee but that nothing has really helped. (*Id.*).

Allen testified that she walks with a cane and can only go maybe fifty feet without the cane or holding onto something. (R. 38). Claimant said that she can stand for about ten minutes and sit for about ten minutes. (*Id.*). If she sits for too long, her leg goes numb, she gets stiff, and she has pain down the back of her leg. (*Id.*). Claimant testified that when she experiences that pain, she has to get up and move around or go lay down. (R. 39). Allen said that she lays down at least three times a day for about an hour. (*Id.*).

Claimant also testified that she takes Zoloft for depression. (*Id.*). Allen explained that before she was on Zoloft, she could not handle the stress and would start crying. (R. 40). Claimant said that she feels so limited because she was told she cannot work. (*Id.*). Allen cried at this point during the hearing. (*Id.*).

Next, Allen testified about her daily activities. (R. 41). She said that she can cook simple things and do a limited amount of washing dishes. (*Id.*). She testified that she does some laundry and drives short distances, but explained that her husband accompanies her to the grocery store because her blood sugar has been known to go low while in the grocery store. (*Id.*).

## D. Medical Expert's Testimony

Medical Expert Dr. Ashok Jilhewar (the "ME") also testified at the hearing. (R. 41-53). The ME testified that Claimant is morbidly obese and has Type 1 diabetes

mellitus that is well controlled. (R. 42-43). He testified that he did not have any documentation regarding Claimant's complications from retinopathy. (Id.). Dr. Jilhewar explained that while her treating source notes that Claimant has retinopathy and the consultative exam states that Claimant's right eye is 20/50 and her left eye is 20/40, he did not have any opthalmological treatment notes. (R. 43-44). The ME further testified that he did not have documentation, even by treating sources, of any neurological defects resulting from Claimant's radicular neuropathy. (R. 44). He explained that while her treating source states that she has neuropathy, there are no clinical findings such as motor weakness stated in the records. (Id.).

Dr. Jilhewar also said that Claimant's testimony regarding complications from hypoglycemia is not documented. (Id.). He noted Claimant's October 2006 hospitalization for low blood sugar, but stated that the frequency of hypoglycemia in Claimant's testimony is much higher than expected for someone on an insulin pump. (Id.). Dr. Jilhewar testified that without documentation, he has no opinion about Allen's testimony concerning the frequency of her hypoglycemic episodes. (Id.).

Dr. Jilhewar also testified that there has been a deterioration in Claimant's walking function between September 2004 and August 2007 because her cardiologist did not think Claimant could walk on the treadmill long enough to complete an exercise stress test. (R. 45). He noted that this information was not available to the Disability Determination Services physician. (Id.). Dr. Jilhewar testified that Claimant had a left knee impairment, that she received a series of injections, and that the doctor's notes state that she was doing better with the injections. (R. 45-46).

Dr. Jilhewar testified that Claimant has a low back impairment and that her MRI

showed a disc bulge at T12-L1.  (R. 46).  However, the MRI also showed that there were no neurological defects.  (*Id*.).  The ME explained that the consultative exam revealed that Claimant had some pain with lumbar flexion, her straight leg raising test was negative, she had an antalgic gait, and she was unable to walk toe to heel.  (*Id*.).

Dr. Jilhewar opined that Claimant is limited to sedentary work.  He based his opinion on Claimant's left knee impairment, her inability to walk toe to heel, and the fact that her cardiologist decided on two occasions that Claimant should not undergo a stress test on the treadmill.  (R. 46-47).  When questioned by Claimant's attorney, the ME stated that he did not have the documentation to determine whether Claimant's diabetes met a listing.  (R. 47).  Dr. Jilhewar testified that in his opinion, based on the available documentation, Claimant's diabetes would have no effect on her residual functional capacity.  (*Id*.).  He also testified that there was no documentation to show that Claimant met a listing for retinopathy or neuropathy.  (R. 47-48).  Dr. Jilhewar explained that he noted Claimant's lower back pain and left knee pain in finding that Claimant is limited to sedentary work.  (R. 48).

The ME also testified that based on the available documentation, he did not think a person with Allen's impairments would have any limitation in sitting.  (*Id*.).  He explained that he did not have documentation of treatment for severe neuropathy and that while Dr. Verenna mentioned radicular pain and slow gait in July 2008, he needed an impairment lasting twelve months.  (R. 50-52).  Dr. Jilhewar also testified that knee pain would not create difficulty sitting.  (R. 50).

### E.    Vocational Expert's Testimony

Vocational Expert Pamela Tucker (the "VE") also testified at the September 18,

2008 hearing. (R. 53-58). The ALJ asked the VE to classify Claimant's past work. (R. 53). VE Tucker testified that Claimant worked as a registered nurse, which is classified as medium, skilled work in the Dictionary of Occupational Titles ("DOT"). (*Id.*). However, she said that her work was heavy as performed. (*Id.*). VE Tucker testified that Claimant had transferrable skills such as recording medical information, taking vitals and patient care. (*Id.*).

The ALJ asked VE Tucker to assume the following hypothetical person: an individual with Claimant's age, education, and work experience who (1) would be limited to sedentary work, (2) could not climb ladders, ropes or scaffolds, (3) could occasionally climb ramps and stairs, and (4) should avoid concentrated exposure to unprotected heights and dangerous moving machinery. (R. 54). The ALJ asked the VE whether such an individual would have transferrable skills and whether there would be jobs for an individual with those transferrable skills. (*Id.*). VE Tucker testified that such an individual would be capable of performing work as a utilization review nurse, a nurse case manager, and a pre-authorization or pre-certification nurse. (*Id.*). She explained that there would be approximately 3,000 jobs in the area for a utilization nurse, 7,000 for a nurse case manager, and 2,500 for a pre-authorization nurse. (*Id.*). VE Tucker testified that the jobs she identified were consistent with those found in the DOT. (*Id.*).

The VE further testified that even considering Dr. Verenna's evaluation, Claimant would still be able to perform the jobs she identified. (R. 55-57). VE Tucker also explained that if a person makes a mistake once in a while, which was her interpretation of a mild limitation in concentration, persistence and pace, that would not jeopardize the person's ability to perform the job. (R. 56-57). The VE conceded if a person had to lie

14

down three times a day for an hour, none of the jobs she identified would accommodate that need. (R. 55). She also conceded that a person who missed work three or more times a month could not meet the demands of the jobs she identified. (R. 58).

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) *(*quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th

Cir. 1985)).

**B.      Analysis under the Social Security Act**

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski*, 245 F.3d at 885-86.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five-step analysis.  At step one, the ALJ found that Claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the period from her alleged onset date of October 26, 2006, through her date last insured of December 31, 2011.  (R. 12).  At step two, the ALJ found that Claimant had the following severe impairments: diabetes mellitus,

16

peripheral neuropathy, degenerative joint diseases of the knees, diabetic retinopathy, low back pain, and morbid obesity. (R. 12). At step three, the ALJ found that the Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13). At step four, the ALJ found that claimant has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.927(a) that does not require climbing ladders, ropes or scaffolds. (*Id.*). The ALJ further found that Claimant can occasionally climb ramps and stairs and that she must avoid concentrated exposure to heights and moving machinery. (*Id.*). The ALJ also found that Claimant is unable to perform past relevant work. (R. 19). However, at step five, the ALJ found that considering Claimant's age, education, work experience, and RFC, Claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. (*Id.*). As a result, the ALJ found that Claimant has not been under a disability from October 28, 2006 though the date of her decision. (R. 20).

Allen argues that the ALJ erred in assessing her credibility, erred in determining her RFC, improperly relied on the ME's opinion, and improperly relied on the VE's testimony.

### C. The ALJ's Credibility Determination Is Supported By Substantial Evidence And Free From Legal Error.

Allen argues that the ALJ failed to follow Social Security Ruling ("SSR") 96-7p and failed to give specific reasons for his credibility determination. To succeed on this ground, Allen must overcome the highly deferential standard we accord credibility

determinations. Because the ALJ is in the best position to evaluate the credibility of a witness, we only reverse an ALJ's credibility finding if it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, the ALJ must abide by the requirements of SSR 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

Under SSR 96-7p, an ALJ must carefully evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96–7p. Further, whenever an individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding based on a consideration of the entire case record, including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*

In making a credibility determination, an ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995). Rather, SSR 96–7p requires an ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than

18

medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p.

Here, the ALJ found that Claimant's testimony regarding the frequency and severity of her symptoms was not fully credible or supportive of any greater limitations or restrictions than included in the ALJ's RFC assessment.[1] (R. 15, 18). In making her credibility determination, the ALJ considered Claimant's statements about her daily activities, the frequency and intensity of her pain and other symptoms, the treatment Claimant received, the fact that her limited treatment may be attributable to her insurance situation, the medications she was taking, her ability to work despite symptoms she alleges are disabling, and Claimant's request for a note authorizing her return to work. (R.14-17). The ALJ also considered the medical opinions in the record concerning Claimant's abilities and limitations. (R. 17-18).

After considering the foregoing evidence, the ALJ stated that even if Claimant's daily activities are truly as limited as alleged, she found it difficult to attribute that degree of limitation to the Claimant's medical condition given the relatively weak medical evidence and the opinion evidence in the record. (R. 17). The ALJ noted that the medical evidence failed to corroborate Allen's testimony regarding the nature, frequency and severity of her hypoglycemic episodes, or that she experiences seizures during those episodes. (*Id*.). The ALJ found that there was no evidence in the record

---

[1] The ALJ took into account certain physical conditions and associated functional limitations (*i.e.*, Claimant's inability to ambulate effectively and the fact that she may experience hypoglycemic episodes) in assessing Claimant's RFC. (R. 17-18).

indicating that Claimant had surgery to address her diabetic retinopathy, nor was there evidence of treatment or evaluation by an optometrist or an ophthalmologist. (R. 15, 17). She noted that Claimant's visual limitations from her retinopathy remain uncorroborated. (R. 15). The ALJ also found that because there was little change in Claimant's treatment records, it appears she was able to work despite symptoms she now alleges are disabling. (R. 17). She further noted that the medical evidence indicates that Claimant's chronic conditions are being medically managed with medications. (R. 15).

It is clear that the ALJ's credibility finding was based on a consideration of the entire case record. Moreover, contrary to Claimant's suggestion, the ALJ's credibility determination contains specific reasons supported by the evidence in the case record. Based on the foregoing, we cannot say that the ALJ's credibility determination was "patently wrong" and therefore, we will not remand on this basis.

### D. The ALJ's RFC Assessment Is Supported By Substantial Evidence And Free From Legal Error.

The ALJ found that Claimant had the RFC to perform a modified range of sedentary work. (R. 17-18). In assessing Claimant's RFC, the ALJ considered medical opinions from four sources: two state agency physicians (Dr. Bilinsky and Dr. Arjimand), Claimant's treating physician (Dr. Verenna), and the medical expert (Dr. Jilhewar). (R. 17-18). The state agency physicians opined that Claimant was capable of performing a limited range of light work (R. 343-353), while both Dr. Verenna and Dr. Jilhewar opined that Claimant was capable of performing activities consistent with sedentary work. (R. 413-416, 46-47). The ALJ explained that she gave minimal weight to the state agency

physicians because the record indicated that Claimant had some limitations with regard to certain workplace abilities. (R. 18). The ALJ stated that she gave great weight to the Dr. Verenna's opinion because Dr. Verenna was Claimant's treating physician and her opinion was supported by the evidence of record. (*Id*.). She also gave great weight to the well supported opinion and analysis provided by Dr. Jilhewar. (*Id*.).

In addition, the ALJ took certain physical conditions and associated functional limitations into account in assessing Claimant's RFC. In particular, the ALJ took into account Claimant's inability to ambulate effectively and the fact that she may experience hypoglycemic episodes. (R. 18-19). As a result, the ALJ found that Claimant cannot climb ladders, ropes or scaffolds, that she can occasionally climb ramps and stairs, and that she must avoid concentrated exposure to heights and moving machinery. (*Id*.). Based on the foregoing, we find that the ALJ's RFC assessment is supported by substantial evidence.

Claimant points to a number of alleged errors by the ALJ in support of her argument that remand is necessary for further consideration of Claimant's RFC.[2] As discussed more fully below, Claimant's arguments are without merit.

### 1. The ALJ Complied With SSR 96-8p.

Claimant argues that the ALJ failed to comply with SSR 96-8p because: (1) she did not do a function by function analysis of Claimant's ability to do work related

---

[2] We note that Claimant's brief is disorganized and at times, unintelligible. Several of Claimant's arguments are undeveloped, difficult to follow, and/or not supported by reference to pertinent authority. The Seventh Circuit has warned that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (internal quotation marks omitted). To the extent that Claimant's arguments fall within these parameters, we find that they are waived and decline to address them.

activities; (2) she did not consider Claimant's doctors or the conclusions of the state agency physicians; and (3) she did not consider the natural progression of Claimant's diabetes mellitus.  We disagree.

Pursuant to SSR 96-8p, "the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p.  As discussed above, the ALJ considered and addressed medical opinions from both the state agency physicians and Claimant's treating physician, Dr. Verenna.  (R. 17-18).  The ALJ evaluated and gave great weight to Dr. Verenna's analysis of Claimant's work related abilities and limitations.  (*Id.*).  The ALJ also discussed the medical evidence received from Dr. Sivarajan, Dr. Wunderlich, St. Joseph's, Dr. Vemareddy, Dr. Murphy, and Dr. Taiwo.  (R. 15-16).  The ALJ then discussed Claimant's daily activities and gave specific reasons why she found it difficult to attribute Claimant's alleged limitations in her daily activities to her medical condition.  (R. 15-17).  In addition, the ALJ incorporated Claimant's inability to ambulate effectively and the fact that she may experience hypoglycemic episodes into her RFC assessment.  (R. 18-19).

It is clear that the ALJ evaluated Claimant's ability to do work related activities and considered all of the relevant evidence, including the progression of Claimant's diabetes mellitus.  (R. 15-18).  Accordingly, we find that the ALJ complied with SSR 96-8p.

## 2.      The ALJ Complied With 20 C.F.R. 404.1512(e).

Next, Claimant argues that the ALJ failed to comply with 20 C.F.R. 404.1512.[3] According to Claimant, the ALJ should have sought Dr. Verenna's treatment notes because they were not in the record. Again, we disagree. An ALJ is only required to recontact medical sources when the evidence received from a claimant's treating physician or other medical source is inadequate to determine whether the claimant is disabled. 20 C.F.R. 404.1512(e). The record demonstrates that the ALJ had enough evidence to determine whether Claimant is disabled. Furthermore, Claimant had only seen Dr. Verenna once before she completed Claimant's medical evaluation. Therefore, it is unlikely that the treatment notes would have led to a different decision in this matter. We find that remand is not warranted on this basis. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) (observing that "[n]o principle of administrative law or common sense requires [a court] to remand a case in quest of the perfect opinion unless there is reason to believe that remand might lead to a different decision").

### 3. The ALJ Properly Evaluated The Medical Evidence, Including the ME's Conclusions.

Claimant also argues that the ALJ erred in accepting the ME's conclusion that the medical evidence failed to corroborate Claimant's impairments resulting from her diabetes mellitus. Dr. Jilhewar acknowledged that Claimant has diabetes mellitus. (R. 42). However, he testified that he did not have any documentation regarding Claimant's complications from retinopathy. (R. 42-44). The ME further testified that he did not have documentation, even by treating sources, of any neurological defects resulting

---

[3] In her brief, Claimant cites C.F.R. 404.152(1). No such regulation exists. We presume Claimant meant 20 C.F.R. 404.1512(e), which addresses the need to recontact medical sources.

from Claimant's radicular neuropathy. (R. 44). Dr. Jilhewar also explained that Claimant's testimony regarding complications from hypoglycemia is not supported by the record. (*Id.*).

Claimant contends that medical evidence in the record supports her claim that she suffers from diabetes with symptoms of retinopathy, neuropathy and hypoglycemia. While it is true that Claimant has been diagnosed with retinopathy and neuropathy, and has experienced hypoglycemic episodes, none of the medical evidence Claimant identifies in her brief establishes the severity or functional limitations resulting from these impairments.[4] A mere diagnosis does not establish functional limitations, severe impairments, or an inability to work. *Stamps v. Astrue*, 2010 WL 5149284, *21 (N.D. Ill. 2010) (citing *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir.1991)); *see also, Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir.2005) ("A person can [have various physical or mental diagnoses] yet still perform full-time work.").

The ME's conclusion that the limitations and severity of Claimant's impairments were not documented is supported by substantial evidence and the ALJ did not err in accepting Dr. Jilhewar's opinion. Moreover, in assessing Claimant's RFC, the ALJ also relied on Claimant's treating physician, Dr. Verenna, who opined that Claimant was capable of performing sedentary work activities. (R. 17-18). Finally, to the extent that there were any conflicts in the medical evidence, the ALJ resolved them in Claimant's favor. Indeed, the ALJ gave great weight to the physicians who found that Claimant was limited to sedentary work, and minimal weight to the state agency physicians who

---

[4] We note that the vast majority of hypoglycemic episodes reflected in the record occurred prior to Claimant's alleged onset date.

found that Claimant was capable of light work.  (R. 18).  We find that the ALJ properly evaluated the medical evidence, including Dr. Jilhewar's conclusions.

### 4.     The ALJ Properly Evaluated The Vocational Expert's Conclusions.

Next, Claimant contends that the VE erred in finding that the Claimant has transferrable skills and is capable of performing work as a utilization review nurse, a nurse case manager, and a pre-authorization or pre-certification nurse.  In particular, Claimant argues that the jobs identified by the VE require a skill level that exceeds her abilities.  Claimant contends that her prior attorney (who no longer represents her) reviewed three sedentary positions in the DOT and determined that those positions would require skills Claimant does not have.  However, the positions Claimant refers to - nurse consultant, nurse registrar, and cardiac monitor technician - are not the same positions the VE identified.  Claimant then argues that job descriptions placed in on-line employment solicitations for a utilization review nurse, a nurse case manager, and a pre-authorization or pre-certification nurse demonstrate that those positions require skills she does not have.  But there is no evidence that the positions the VE identified require the same skills as the positions posted on-line.

Moreover, Claimant did not object to the VE's testimony concerning the skills and tasks required for the jobs she identified.  Therefore, we find that Claimant waived this argument.  *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (stating that "when no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the [DOT]").

Claimant also argues that the VE erred in finding that Claimant could perform the jobs she identified with mild limitations in concentration, persistence and pace. VE Tucker testified that if a person makes a mistake once in a while, which was her interpretation of a mild limitation in concentration, persistence and pace, that would not jeopardize the person's ability to perform the jobs she identified. (R. 56-57). Claimant contends that the VE's testimony does not make sense when the position is in the health care industry, which requires a high level of accuracy. However, the VE explained that the jobs she identified do not necessarily involve direct patient care. VE Tucker said that some of the jobs could involve handling paperwork, working outside in the community, or working for insurance companies. The ALJ was entitled to rely on this testimony.

In short, we find that the ALJ properly evaluated and relied on the VE's conclusions. While Claimant may disagree with the VE's conclusions, she has offered no legitimate reason to remand this case for further consideration of Claimant's RFC. Because the ALJ's RFC assessment is supported by substantial evidence and free from legal error, remand is not warranted.

**E.    Claimant's Remaining Arguments Are Baseless.**

Claimant argues that the ALJ erred in failing to consider the impact of the Grids, particularly Rule 201.14 of the Medical-Vocational Guidelines. However, Rule 201.14 does not apply to Claimant. Rather, it applies only to individuals who have no transferrable skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.14. Here, the VE testified that Claimant had transferrable skills such as recording medical information, taking vitals and patient care. (R. 53).

Finally, Claimant has waived her contention that she qualifies as a "worn-out worker" by failing to cite any pertinent authority. *Holm*, 326 F.3d at 877. Claimant would not have met the requirements of the worn-out worker rule in any event as she has a college education and worked in a skilled job for thirty-two years. *See* 20 C.F.R. §§ 404.1562 and 416.962.

III. **CONCLUSION**

For the reasons set forth above, Claimant's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted. It is so ordered.

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: August 1, 2011**